THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

FILED
2023 DEC 15 PM 12: 15
CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____

| | | |
|---|---|---|
| 14522 RYDER GRAY DRIVE, | § | |
| BEE CAVE, TEXAS, 78738, | § | |
| JANE DOE | § | |
|     Tenant, | § | |
| | § | |
| vs. | § | CIVIL ACTION NUMBER_____ |
| | § | COMPLAINT |
| CT CORPORATION SYSTEM | § | |
| (REGISTERED AGENT), | § | 1:23CV1525 DII |
| SPILLMAN RANCH HOMES LP, | § | |
| THE NRP GROUP, | § | |

## 14522 RYDER GRAY DRIVE BEE CAVE, TEXAS 78738's ORIGINAL PETITION

14522 RYDER GRAY DRIVE BEE CAVE, TEXAS 78738, JANE DOE ("*Tenant*") files its Original Petition complaining of SPILLMAN RANCH HOMES LP, THE NRP GROUP, KIMBERLY FISHER (REGIONAL MANAGER), and ASHLEY DODDENHOFF, (SENIOR REGIONAL MANAGER), CADE CLARKSON (MANAGER IN TRAINING), TOSHI HINES (SENIOR COMMUNITY MANAGER) ("*Landlord*") as follows:

### BRIEF BACKGROUND ON PLAINTIFF

1. Prior to disability, the Plaintiff with over a decade of corporate advancement, was employed as the Senior Vice President of Compliance for a Texas based real estate brokerage firm and successfully advised real estate developers, asset managers, and multi-family property owners. She holds nine property management certifications, including the specialized designation *Housing Credit Certified Professional* and successfully established and implemented program compliance for a real

estate portfolio with over sixty properties in Texas, Florida, Hawaii, Connecticut, Puerto Rico, California, South Carolina, Louisiana, Kentucky, Colorado, and Maryland. In 2019, she was forced to exit the workforce due to several serious medical conditions caused by domestic violence and a traumatic birth. To further secure and protect the location of the Plaintiff, this petition could not disclose her identity. In 2022, alone with her five-year old who has 'unique abilities' (Gifted, Attention Deficit Hyperactivity Disorder and Speech Articulation Disorder) relocated to the Bee Cave, Texas area in hopes of starting a new life. The divorced Plaintiff invested 77.64% above Austin's average rent (2022 Austin City Council District-by-District Analysis) to ensure the health, safety, and medical accessibility of their new neighborhood.

2. Before beseeching the court, Plaintiff attempted on several occasions, to resolve this matter with the Landlord. Landlord refused. Plaintiff attempted to secure the services of an attorney and assistance from The Texas Workforce Commission, however, due to the relentless discriminatory practices of the Landlord, time was of the essence and the Tenant could not risk the looming threat of homelessness or mental breakdown posed by the Landlord. The following chronicles her experience.

## I. INTRODUCTION

3. Nearly one quarter of all individuals experiencing homelessness have a disability. African American women are the majority of homeless single-parent families, making up 43% of the total. Homelessness has a tremendous impact on children – their education, health, sense of safety, and overall development. Children experiencing homelessness have higher levels of emotional and behavioral problems, have increased risk of serious health problems, experience more school mobility, repeat a grade, be expelled or drop out of school, and have lower academic performance.

4. Raw sewage is a biohazard that can contain harmful microorganisms such as Salmonella,

Escherichia coli, Listeria bacteria, Cryptosporidium parasite, Adenovirus, Norovirus, Rotavirus, and Asphyxiation which can cause serious illness and even death. This biohazard must accompany proper protection protocols and clean-up techniques that are required to return affected areas back into a safe, usable, hygienic environment.

5. Home theft victims suffer a broad range of psychological and social injuries that persist long after the incident occurred. Intense feelings of anger, fear, isolation, low self-esteem, helpless- ness, and depression are common reactions. Like combat veterans, crime victims may suffer from post-traumatic stress disorder, including recurrent memories of the incident, sleep disturbances, feelings of alienation, emotional numbing, and other anxiety-related symptoms.

6. Gifted children with ADHD must maintain a consistent schedule/routine and work with ADHD specialists to ensure that they are receiving the support they need for optimal development.

7. Landlord's discriminatory practices were especially egregious as they were predatory in nature. Tenant is a disabled African-American single mother to a six year old with 'unique abilities' who was forced to live in uninhabitable conditions for half of 2023 while making monthly rent payments. She was coerced into signing a fraudulent liability release waiving of all human rights, endured mental torment from the Landlord repeatedly entering her home without permission in her presence and stealing from her household in her absence. Landlord ignored and denied a reasonable accommodation request that would have provided the Tenant an equal opportunity to enjoy the dwelling. Landlord repeatedly threatened to evict Tenant and her daughter without just cause which led to major disturbances in the Tenant's quality of life, homeschool schedule, and child's extracurricular activity schedule. Landlord refused to notify Tenant of lease renewal offer or nonrenewal when inquired by Tenant but insisted on inflating her monthly rent once the initial lease had expired. Tenant now seeks damages and remedies provided by the law totaling $115,280 for Landlord's gross negligence, cruelty, and reckless disregard for the protections of the Fair Housing

Act laws.

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 3614(a) and 12188(b)(1)(B).

9. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' allegations occurred in the Western District of Texas, the subject property is located in this District, and the Defendant resides in this District.

## III. SUBJECT PROPERTY

10. Brisa Townhomes 810 Brisa Wy, Bee Cave, TX 78738

## IV. PARTIES

11. Plaintiff, Jane Doe, is a domestic violence victor who cannot disclose her identity for safety and protective reasons. She is an individual who resides at 14522 Ryder Gray Drive Bee Cave, Texas 78738.

12. Defendants, Spillman Ranch Homes LP is a limited partnership registered as a Texas foreign entity originating in the state of Delaware. The NRP Group is the management company based in Austin, Texas that professionally manages the day to day operations at Brisa Townhomes, the property where the Plaintiff resides. CT Corporation Systems is the registered agent for Spillman Ranch Homes LP.

## V. FACTUAL ALLEGATIONS

**Fair Housing Act Factual Allegations**

12. Landlord's unlawful discriminatory treatment of Tenant were based on the Tenant's protected class of being African American (race), disabled (disability), and a single mother (familial

and gender).

13. On September 23, 2022, Tenant and Landlord entered into a residential lease (the "*Lease*")for 14522 Ryder Gray Drive Bee Cave, Texas 78738 (the "*Premises*") of certain real property located at Brisa Townhomes 4810 Brisa Way, Bee Cave, Texas 78738. Landlord suddenly assigned the tenant a new unit before Tenant moved into the originally assigned unit, Landlord knew that the newly assigned unit had pipe issues. Due to the magnitude of the relocation (moved from Florida), disability limitations, and young child in tow, Tenant did not fully occupy the unit until mid-December 2022. Upon full time occupancy, the unit began overflowing with raw sewage.

14 . The Lease identifies the rights and obligations of the Landlord and Tenant. with respect to repairs to the Premises:

> **We'll act with customary diligence to make repairs and reconnections within a reasonable time, taking into consideration when casualty-insurance proceeds are received. Unless required by statute after a casualty loss, or during equipment repair, your Rent will not abate in whole or in part. "Reasonable time" accounts for the severity and nature of the problem and the reasonable availability of materials, labor, and utilities.**

15. Pursuant to the Lease, On January 6, 2023 the Tenant notified Landlord of a raw sewage leak overflowing in the backyard and garage. Landlord did not attempt to sanitize the unit/garage until January 13, 2023. Unlike with tenants that were not disabled, African-American single mothers, Landlord did not repair the pipes. The unit was uninhabitable. Tenant continued to make full timely rent payments.

16. On January 23, 2034, Landlord repaired the pipes for Building Ten but refused to repair the pipes for Tenant's unit, accusing Tenant of causing raw sewage leak by flushing 'baby wipes.' Tenant did not have baby wipes in her possession for years. This inaction was due to the fact that the tenant was a disabled, African-American single mother.

17. Pursuant to the Lease, Landlord was required to reimburse Tenant for damage caused by non repair.

**If we fail to timely repair a condition that materially affects the physical health or safety of an ordinary resident as required by the Texas Property Code, you may be entitled to exercise remedies under § 92.056 and § 92.0561 of the Texas Property Code.**

18. On February 6, 2023 Tenant again notified Landlord of a raw sewage leak overflowing in the backyard and garage. The Tenant requested to be moved to another unit. Landlord discriminated against Tenant for requesting repair and compensation for damaged items and denied the request because she was a disabled African-American single mother. Some of Tenant's property stored in the garage was destroyed. Landlord did not repair the pipes. The unit was uninhabitable. Tenant continued to make full timely rent payments.

19. On April 27, 2023 again the Tenant notified Landlord of a raw sewage leak overflowing in the backyard and garage. The Tenant requested to be moved to another unit. Landlord denied the request. Landlord did not repair the pipes. Landlord did not sanitize the impacted area. Tenant purchased cleaning agents to sanitize areas affected by raw sewage. The unit was uninhabitable. Tenant continued to make full timely rent payments.

20. On May 11, 2023 Instead of Landlord making a diligent effort to identify the true cause of raw sewage leaks, Landlord accused Tenant of causing sewage backup with her use and flushing of tampons but did not make the same ridiculous accusations against tenants that were not disabled, African-American single mothers .

21. On May 17, 2023, Landlord discriminated against Tenant for exercising Tenant's rights provided by the lease contract Clause 15.4. Tenant requested the replacement of Tenant property destroyed by the second raw sewage leak caused by the Landlord faulty pipes. Having absorbed the cost of the damages caused by the first raw sewage leak, the Tenant filed a rental insurance claim for the replacement of her belongings. The claim was denied by the insurer due to Landlord/Property Owner negligence. Tenant then submitted the loss to Landlord for payment as suggested by the rental

insurer. Landlord demanded and pressured Tenant to sign a liability waiver/settlement agreement that waived all landlord obligation to the tenant (violating Texas Property Code. 92.006.(c)) while holding Tenant responsible for continuing to make full timely rent payments for an uninhabitable unit. This was not required of tenants that were not disabled, African-American single mothers,

22. On May 19, 2023 the Tenant, after being pressured by Regional Property Manager Kimberly Fisher to consent to the release of liability for rightful compensation of damaged property, without the opportunity of retaining legal counsel (Tenant expressed in writing her concern regarding the intensity of the agreement's verbiage), incapacitated due to the compliant use of recently prescribed stress medication, and emotionally worn by the prolonged unsafe and dangerous living conditions, signed the agreement waiving landlord duty. It was not until later after discontinuing the use of medication for stress, that the Tenant comprehended the trickery she had succumbed to. The socially abhorrent contract was in effect a 'get out of jail free card' that legally rendered Tenant and her six year old daughter subhuman. Landlord held Tenant responsible for continuing to make full timely rent payments while having no legal accountability as a landlord. With reckless disregard to the law, Landlord intentionally and fraudulently made a material misrepresentation in the waiver that was false by describing the maintenance issue as a 'water leak' instead of the health and safety code violations of the 'raw sewage backups' taking advantage of the Tenant's disability. The Landlord intended the inducement to cause the Tenant's reliance and agreement. Landlord did not require a similar release of liability to other non disabled, African American single mother tenants.

23. On May 24, 2023, again the Tenant notified Landlord of a raw sewage leak overflowing in the backyard and garage. Landlord did not sanitize the impacted area. Landlord did not repair the

pipes. The unit was uninhabitable. Tenant continued to make full timely rent payments.

24. On May 27, 2023, After the pipes overflooded at a white male's neighboring unit (whom they did not require a liability waiver), the Landlord finally made a diligent effort in trouble shooting the cause of the raw sewage backups. James Camper, Landlord's employee inquired about the liability waiver signed by Tenant highlighting that it waived all Landlord responsibility and guaranteed legal impunity for acts of vendors, employees, etc.

25. On June 8, 2023 Landlord via their employee, James Camper, the new property maintenance employee, informed Tenant that the pipe repair was a major repair and would be scheduled for the upcoming week of June 12, 2023. Landlord's employee assured Tenant that he would inform her of the specifics ahead of time as she insisted on being present so she could secure her property and make accessible any area needed for the repair. Trusting Landlord's employee, Tenant proceeded with her travel plans previously arranged and left town with her now six year old to support a nonprofit charity in Florida.

26. On June 9, 2023 Landlord's employee, James Camper called Tenant after business hours notifying her that Roto Rooter suddenly found a place "to squeeze in" the Tenant's repair work and had begun repairing the pipe. This was suspicious and disturbing as Tenant was not given the opportunity to secure property, lock entry doors, and remove valuables in preparation for this work as the Landlord had assured just the day before.

27. On June 10, 2023 Tenant, still out of town, contacted Kimberly Fisher, Landlord's Regional Property Manager who initially told Tenant that no entry was needed or made to her residence and work would not begin until Monday. However, Fisher sent a second email three hours later claiming that onsite staff noticed that "the garage was up a few inches" (which was a common resident practice that Tenant had participated in). Landlord claimed that the garage door, which had no previous operational issues, suddenly needed to be repaired. Landlord maintained that Camper, the

maintenance contact, "never entered" Tenant's unit in her absence. Landlord staff did not enter other resident units who also left their garage partially opened for cool air to circulate. Landlord singled out Tenant's unit for theft because of the vulnerability of being a disabled African American single mother.

28. On June 11, 2023 around midnight On June 12, 2023 Tenant arrived back home after having cut short her trip. Tenant immediately noticed that Landlord had indeed entered her home without consent and without emergency. Tenant immediately noticed that costly items that were present when she left her home, were no longer in her home upon her return. In addition, the air conditioning unit was inoperable and the batteries removed from the thermostat by Landlord during Tenant's absence. The ac filter had been changed, and all entry doors had been unlocked by Landlord during Tenant's absence. The Tenant immediately contacted law enforcement and later filed a police report specifying the stolen items.

29. On June 13, 2023 Landlord began creating work orders fraudulently misrepresenting Tenant's maintenance raw sewage issues as "clogged drain in the garage." Landlord did not make this effort for tenants who were disabled, African-American single mothers.

30. On or around June 14,2023-Landlord discriminated against Tenant for exercising her right to summon police. Tenant attempted to inform Landlord's corporate office and report onsite staff for lease violations. Weaponizing the fraudulent liability waiver, Landlord's Ashley Doddenhoff, refused to initiate any investigation into the incident and accused Tenant of fabricating onsite staff's unlawful entry. Doddenhoff insisted that "it never happened" as if she were present at the time. Landlord refused to disclose the names of all of their employees who entered Tenant's home in her absence without written permission or emergency. Tenant was unable to report the identities of all Landlord employees that entered her home unlawfully to law enforcement. Landlord's attempt to gaslight

Tenant prompted Tenant to employ the services of a forensic scientist to lift and separate fingerprints and assist law enforcement's investigation and further prove Landlord's unlawful entry.

31. On June 18, 2023, Tenant's air conditioner stopped working and the garage door went off track. Tenant notified Management. In retaliation, Kimberly Fisher, fully informed of the ongoing criminal investigation against James Camper, disregarded Tenant safety and insisted on sending James Camper to her home to repair the items. Tenant refused him entry as she was alone with a six year old and notified Kimberly Fisher law enforcement would be summoned if Camper was ever sent to Tenant's home. Tenant also reported the garage door off track and needed to be repaired after being tampered with in her absence by Landlord's employees.

32. On June 20, 2023, for reporting Landlord's employee to law enforcement for unlawful entry, theft and for requesting repair, Landlord's Regional Manager Kimberly Fisher claimed that their vendor/garage repair company was booked for a week and could not provide a date to repair. Tenant's car was her only mode of transportation and was trapped in the garage. She was unable to attend doctor appointments. Fisher suggested that Tenant pull a cord that could have caused the entire garage door to collapse. Concerned for her own safety, Tenant secured the services of a garage door repair company and paid for the repair herself. Management refused to reimburse Tenant for the expense.

33. On June 30, 2023, Because Tenant refused entry of Landlord's employee James Camper who Landlord knew had a pending criminal investigation with the local police department for theft into her unit, Landlord began harassing and intimidating Tenant by fabricating several bogus lease violations. Landlord enlisted a law firm to further intimidate and threaten Tenant and her six year old with homelessness. Tenant had never before been issued any lease violations and had paid timely rent, even for the six months when the unit was uninhabitable. The Landlord further weaponized the fraudulent liability waiver Tenant had been swindled into signing believing they had legal impunity.

Landlord accused Tenant of several lease violations while never abiding by any of the lease terms including the landlord duties that could not be waived.

34. On July 5, 2023, Tenant submitted a fair housing complaint with HUD and The Texas Workforce Commision reporting Landlord.

35. On July 8, 2023, Tenant's friend who witnessed the discriminatory treatment suffered by Tenant posted a company review on social media detailing what Tenant was being forced to endure to prevent others from such treatment. As part of the vulnerable population, Tenant's advocate initiated contact with Governor Abbot's office to implement a law similar to Florida's F.S. 509.242(1)(d)) that requires landlords and property managers heightened safety procedures of protection for vulnerable renters. Tenant's friend also sent a copy of the review to Landlord's corporate email account to ensure receipt.

36. Only after the public was notified and contact had been made with Governor's Abbot office, did the Landlord initiate an investigation into their staff's discriminatory conduct having been notified previously of the unlawful entry to Tenant home.

37. On July 24, 2023, Landlord continued to harass by threatening Tenant to charge daily fees for trash and recycle bins kept out, a common resident practice that had been acceptable since the start of the lease. Tenant requested a reasonable accommodation. Landlord refused and ignored the request.

38. On August 10, 2023, Landlord continued to harass Tenant into submitting her notice to vacate with no regard that Tenant had a child with unique abilities that required consistency and stability. In addition, Tenant was unable to leave the unit unattended during business hours in fear of Landlord unauthorized entry. Tenant had to limit out- of- town trips or schedule same day trips when she and her six year old could fly out of Austin in the morning and fly back into Austin the same night.

39. On October 3, 2023, Landlord discriminated against Tenant by refusing to offer lease renewal or notify Tenant of nonrenewal. Tenant inquired of lease renewal and new charges. Landlord refused to respond. Landlord began charging Tenant for rental insurance lapse fees when Tenant's rental insurance was current and had submitted renewal policy prior to the expiration of the current policy. It is Landlord policy to notify their tenants of the option of a lease renewal prior to the lease expiration. All of Tenant's neighboring lease holders were notified prior to the lease expiration of Landlord renewal terms. Landlord refused to offer the same services to Tenant.

40. On October 12, 2023, Landlord, in good faith, attempted to resolve Landlord lease violations and damages incurred by Tenant. Landlord refused to respond.

41. On October 18, HUD and The Texas Workforce Commision began investigating Landlord.

42. On October 21, 2023, Landlord retaliated against Tenant for submitting a complaint with The Texas Workforce Commision and breached the covenant of peaceful and quiet enjoyment. Landlord, true to form, provided a third party access and permitted them to enter her home without Tenant notice, emergency, or request. She and her six year old were traumatized by the sudden entrance of a stranger to their home.

43. On October 30, 2023, Tenant, due to Landlord's gross discriminatory practices, harassment, retaliation, and disregard for the health and safety of Tenant, she submitted her notice to vacate the unit to ensure the safety of her Tenant and her first grader.

44. On November 1, 2023, Landlord discriminated against Tenant for filing a fair housing complaint with the Texas Workforce commission by continuously charging Tenant for fees she did not owe (i.e. rental insurance coverage) and refusing to correct charges.

45. On November 7, 2023, Tenant withdrew Fair Housing Complaint with The Texas Workforce in order to expedite legal proceedings.

46. On December 3, 2023, Landlord continued to retaliate against Tenant for submitting a complaint with The Texas Workforce Commission continued to retaliate and harrass against Tenant. Tenant was prevented from paying rent on time due to excessive lease charges. When Tenant reached out to Landlord to correct charges via email, voice messages, and calls to the corporate office, Landlord did not return Tenant's correspondence.

47. On December 12, 2023-December 13, 2023, Tenant finally made contact with Landlord and again asked to have lease charges corrected to comply with Texas Property Code. Landlord, Toshi Hines and Cade Clarkson retaliated against Tenant for submitting a complaint with The Texas Workforce Commision against the Landlord by justifying the inflated month-to-month rental terms that were not consistent with the initial lease agreement and attempted to further intimidate and harass Tenant by threatening to deploy Landlord's attorneys if Tenant didn't comply with the extortion.

48. On December 13 2023, after paying December rent with certified funds the day before, Landlord retaliated against Tenant for submitting a complaint with The Texas Workforce Commision and utilized a law firm to further inflict fear and emotional instability on the disabled African-American single mother.

## LEGAL AUTHORITY

49. Each of the units located at Brisa Townhomes are a "dwelling" and contains "dwellings" as defined by 42 U.S.C. § 3602(b)

50. Each of the units located at Brisa Townhomes contains "covered multifamily dwellings" within the meaning of 42 U.S.C. § 3604(f)(7).

51. The covered multifamily dwellings at Brisa Townhomes are subject to the requirements of 42 U.S.C. § 3604(f).

52. It is unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, national origin or disability. 42 U.S.C. § 3604(b),

(f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

53. Landlord has violated the Fair Housing Act *42 U.S.C. § 2000d-1* which makes it illegal to harass persons because of race, color, religion, sex (including gender identity and sexual orientation), disability, familial status, or national origin.

54. Landlord has violated the Fair Housing Act *42 U.S.C. §§ 3601-19* which makes it illegal to discriminate, threaten, coerce, intimidate or interfere with anyone exercising a fair housing right or assisting others who exercise the right and/ or to retaliate against a person who has filed a fair housing complaint or assisted in a fair housing investigation.

55. Landlord has violated the Fair Housing Act *42 U.S.C. §§ 3601-19* which makes it illegal to discriminate to make housing unavailable (denying transfer of new unit), set different terms (refused lease renewal), conditions or privileges for sale or rental of a dwelling, provide a person different housing services or facilities, impose different sales prices or rental charges for the sale or rental of a dwelling (raised month-to-month rent over $500 a month above original lease terms), refuse to negotiate for housing(raised month-to-month rent over $500 a month above original lease terms), falsely deny that housing is available for inspection, sale or rental (refused to relocate when Tenant originally requested), harass a person, fail or delay performance of maintenance or repairs, limit privileges, services or facilities of a dwelling (couldn't flush toilet for fear of pipe backup for six months), assign a person to a particular building or neighborhood or section of a building or neighborhood (re-assigned Tenant to uninhabitable unit before move-in).

### VIII. PRAYER

**WHEREFORE**, Tenant prays for judgment against Landlord as follows:

56. For damages in the amount of $115,280.00.

57. The Tenant in pursuant to 42 U.S.C. § 3610(g)(2)(A), hereby charges Respondent with engaging in discriminatory housing practices in violation of 42 U.S.C. § 3604(a), (b), (c) and (f), and prays that an order be issued that: 1. Declares that the discriminatory housing practices of Respondent, as set forth above, violate the Fair Housing Act, 42 U.S.C. §§ 3601-19;

58. Enjoins Respondent and its agents, employees, successors, and all other persons in active concert or participation with it, from discriminating because of race, color, religion, sex, familial status, national origin or disability in any aspect of the sale, rental, use, marketing, or advertising of dwellings and related services pursuant to 42 U.S.C. § 3612(g)(3); 7

59. Requires Respondent's agents and employees to attend, at Respondent's cost, training that addresses the Fair Housing Act's prohibitions against discrimination in advertising;

60. Awards such damages pursuant to 42 U.S.C. § 3612(g)(3) as will fully compensate any aggrieved persons for any harm caused by Respondent's discriminatory conduct;

61. Awards the maximum civil penalty against Respondent for each violation of the Act, pursuant to 42 U.S.C. § 3612(g)(3) and 24 C.F.R. § 180.671; and 6. Awards such additional relief as may be appropriate under 42 U.S.C. § 3612(g)(3).

62. Awards such additional relief as may be appropriate under 42 U.S.C. § 3612(g)(3).

Respectfully Submitted,

*Jane Doe*